**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| **PRIME VICTOR INTERNATIONAL LIMITED** | : | **CIVIL ACTION** |
| | : | |
| | : | |
| **v.** | : | **NO. 23-176-MAK** |
| | : | |
| **SIMULACRA CORPORATION** | : | |

## <u>MEMORANDUM</u>

**KEARNEY, J.**                                                           **July 14, 2023**

Entities borrowing a million dollars either know, or should know, the import of language in the document they sign defining how they must repay the million-dollar loan. We expect they negotiate and choose the words in their loan obligations. We appreciate creative trial lawyering long after the fact attempting to create ambiguity in those words chosen years earlier. If you think about a word long enough, you may convince a judge there may be some ambiguity warranting a trial. But the challenger must offer a reasonable interpretation. And the borrower does not take us there today. The borrower agreed in 2019 to repay a million-dollar loan and unpaid interest by December 31, 2022. The lender agreed the borrower could repay by either cash or shares in the borrower company until "termination" of the Note. The borrower did not pay the loan back by cash or shares by December 31, 2022. But it secretly converted the debt to shares without telling the lender six weeks after the loan matured and ten days after a demand letter. The lender sued and the borrower argues it repaid with shares six weeks after the default. It claims the note did not "terminate" when it failed to repay by December 31, 2022. We find no ambiguity in "termination" given the context of the entire agreement. Borrower's theory would allow it to never pay back the million dollars and instead convert the debt to shares or otherwise pay back whenever it felt like it. We cannot reasonably go this far. We grant the lender's motion for judgment on the pleadings.

## I.   Alleged facts in the pleadings.[1]

Simulacra Corporation owns three separate companies.[2] Simulacra sought up to three million dollars of investment funding from outside investors in 2019.[3] It discussed investment funding through unsecured promissory notes with several potential investors including Prime Victor International Limited.[4]

### *Prime Victor agrees to loan Simulacra one million dollars.*

Prime Victor agreed to lend Simulacra one million dollars sometime in December 2019.[5] The parties negotiated an Amended and Restated Unsecured Convertible Promissory Note for one million dollars and an Amended and Restated Subscription Agreement they signed on December 31, 2019.[6] Prime Victor wired one million dollars to Simulacra's bank account the same day.[7] Simulacra confirmed receipt of the million dollars two days later.[8]

### *The terms of the Note.*

Simulacra agreed to repay Prime Victor "the principal sum of One Million Dollars ($1,000,000), or such lesser amount as shall equal the outstanding principal amount hereof, together with interest from the date of this Note on the unpaid principal balance at a rate equal to 8% compounded annually."[9] The parties agreed borrower Simulacra would pay back lender Prime Victor the one million dollars plus unpaid interest "on the earlier to occur of": (1) Simulacra issuing stock to Prime Victor through an automatic conversation of the Note; (2) Simulacra paying or setting aside the amount due; (3) the third anniversary of the date of the Note defined as the "Maturity Date"; or (4) an Event of Default.[10]

The third anniversary of the Note—the Maturity Date—occurred on December 31, 2022.[11] The parties agreed Simulacra must pay the Outstanding Balance due under the Note by either cash or converted shares by December 31, 2022 "[i]f not repaid or converted earlier[.]"[12]

Prime Victor and Simulacra agreed, instead of repaying Prime Victor the one million dollars, Simulacra could convert its debt to equity totaling at least one million dollars "before the termination" of the Note which would have the effect of converting the amount due under the Note to Conversion Shares.[13] But the parties did not define the word "termination" in the Note.

The parties agreed an "Event of Default" would occur under the Note if Simulacra failed to pay the principal payment on the date due, or if it failed to make an interest payment within forty-five days of Prime Victor providing written notice to Simulacra of its failure to pay the interest due.[14] Simulacra's default increased the interest rate to ten percent, but if Simulacra cured the default, the interest would return to eight percent.[15] And Simulacra agreed to waive notice of the default, and all other notices.[16] But Prime Victor retained certain rights upon default. It could by written notice to Simulacra, declare all outstanding payment obligations "immediately due and payable[.]"[17]

The parties agreed they would each pay their own costs arising from disputes arising under the Note, but the "prevailing" party would be entitled to reasonable attorneys' fees and costs.[18]

### *Simulacra fails to pay by the Maturity Date.*

Simulacra did not pay the million-dollar principal and accrued interest due under the Note by December 31, 2022—the Maturity Date.[19] It also did not convert the million dollar debt to shares by December 31, 2022. Simulacra knew it defaulted; its President and Chief Executive Officer Matt McMullen told Prime Victor's agent Yi Zhang "I don't sleep very well knowing we are in default on your note" on January 15, 2023.[20]

Counsel for Prime Victor sent Simulacra a demand letter on February 5, 2023 confirming Simulacra's failure to pay by the December 31, 2022 Maturity Date constituted an Event of Default under the Note and "all outstanding Obligations . . . became immediately due and payable."[21]

3

Prime Victor demanded payment in full within ten days.[22] Simulacra did not pay. It did not mention converting the defaulted million-dollar loan to some form of ownership.

### *Prime Victor sues Simulacra*

Prime Victor sued Simulacra to recover its loan after Simulacra did not pay.[23] Prime Victor alleged Simulacra is in default under the Note because Simulacra failed to make any payments due under the Note by the Maturity Date.[24] Prime Victor alleged Simulacra owes one million dollars which constitutes the remaining principal balance due under the Note, plus pre-default interest at a rate of eight percent compounded annually, post-default interest at a rate of ten percent compounded annually, and attorneys' fees and costs.[25]

On March 24, 2023, Simulacra answered and raised various affirmative defenses;[26] and delivered a letter claiming on February 14, 2023—about seven weeks after the Maturity Date and on the last day to pay under Prime Victor's demand—it secretly converted the outstanding million dollar debt to shares in Simulacra.[27] Simulacra claimed "the Conversion . . . rendered the Note and obligations thereunder of no further force and effect."[28]

## II.   Analysis

Lender Prime Victor now moves for judgment on the pleadings against its borrower Simulacra.[29] Prime Victor argues: (1) the unambiguous language of the Note required Simulacra to pay the unpaid principal and interest by the Maturity Date, which it admittedly did not do; (2) we should reject Simulacra's anticipated arguments because they rely on misinterpretation of the Note and are inconsistent with Delaware law; and (3) none of Simulacra's affirmative defenses preclude judgment on the pleadings.[30]

Simulacra responds asking us to deny Prime Victor's Motion and permit the parties to proceed into discovery because: (1) it converted the amount due under the Note to equity after the

Maturity Date but before the undefined "termination" of the Note which extinguished its obligation to pay the unpaid principal and interest; and (2) even if we find it did not convert the amount due to equity before the Note terminated, Simulacra still had a forty-five day cure period and the conversion occurred before the cure period expired.[31] But Prime Victor replies: (1) no reasonable reading of the Note permits a post-default conversion; (2) the word "termination" does not render the Note ambiguous; (3) there is no relevant cure period or notice requirement in the Note; and (4) Simulacra waived its affirmative defenses and any arguments against Prime Victor's request for attorneys' fees and costs by not contesting them.[32]

We studied the pleadings and welcomed an extended oral argument.[33] Simulacra confirmed it did not move for judgment on the pleadings and only opposes Prime Victor's Motion, as it believes the Note is ambiguous. It instead asks to proceed to discovery to determine what the drafters intended when they used the term "termination."

We find the Note is unambiguous. We grant judgment on pleadings in favor of Prime Victor.

### A. Prime Victor is entitled to judgment.

Prime Victor sues Simulacra for breach of contract.[34] Prime Victor now asks we grant judgment in its favor because there are no material issues of fact which remain to be resolved.[35] It argues the Note unambiguously required payment of the unpaid balance, if not repaid or converted earlier, by the Maturity Date of December 31, 2022.[36] It is uncontested Simulacra never paid Prime Victor the unpaid balance by December 31, 2022.[37] But Simulacra responds we should not grant judgment in Prime Victor's favor because "a key question" is whether the Note unambiguously and expressly precludes the conversion to equity after the Maturity Date.[38]

Prime Victor must establish three elements to prevail on its breach of contract: (1) the existence of a contract, express or implied; (2) breach of an obligation imposed by the contract; and (3) damages.[39] The parties agree the Note is a valid and binding contract governed by Delaware law.[40] The parties also agreed Simulacra did not pay Prime Victor the unpaid principal and interest, and the parties do not dispute the amount owed.[41]

The parties' dispute concerns whether a breach occurred which precluded Simulacra from converting the debt to equity on February 14, 2023. Prime Victor contends Simulacra breached because the Note unambiguously required payment of the Outstanding Balance by the Maturity Date of December 31, 2022.[42] Simulacra disagrees and argues the Note is ambiguous as to when Simulacra could convert its debt to equity regardless of the Maturity Date.[43] Simulacra contends it converted the Outstanding Balance to equity on February 14, 2023, which extinguished its obligation to pay the unpaid principal and interest since nothing in the Note limits its conversion rights to occur *after* the Maturity Date.[44] Simulacra argues the Note only limits its right to convert the outstanding debt to equity "before the termination of the Note," and "termination" is an undefined term.[45] So, according to Simulacra, the word "termination" must mean something different than "Maturity Date" because giving the two words "the same meaning as other defined contractual terms would render it mere surplusage and would interfere with the Note's overarching plan."[46] Simulacra contends "it is conceivable that the Note contains terms which cannot be indisputably reconciled on the face of the Note making it ambiguous."[47] Simulacra asks we allow the parties to proceed to discovery to identify extrinsic evidence (to the extent any exists) to help resolve the ambiguity in the Note.[48]

We need not proceed to discovery because we find as a matter of law the Note is unambiguous. Simulacra's creative argument cannot withstand our scrutiny.

## 1. Simulacra agreed to pay Prime Victor by the Maturity Date.

The interpretation of the language of a contract is a question of law.[49] "Delaware law adheres to the objective theory of contracts, *i.e.*, a contract's construction should be that which would be understood by an objective, reasonable third party."[50] The goal of contract interpretation is to "effectuate the parties' intent."[51] We begin with the text of the Note to determine the parties' intent.[52]

We read the Note as a whole when interpreting a contract, and "enforce the plain meaning of clear and unambiguous language."[53] We interpret contracts to "give each provision and term effect" and not render any terms "meaningless or illusory."[54] We must read the contract as a whole, giving meaning to each term and avoiding an interpretation rendering any term "mere surplusage."[55] We "give effect to the plain meaning of the contract's terms and provisions" if a contract is clear and unambiguous.[56] We "can look to dictionaries for assistance in determining the intended meaning of contract terms."[57] Although the preamble or recital language to a contract is generally "not a necessary part of a contract," we "do consider preamble or recital language necessary where . . the language defines terms used in the contract," and "offer[s] insight into the intent of the parties[.]"[58]

So the question always becomes whether the alleged defaulting party can cite to some language in the Note as ambiguous allowing it to argue against what appears to be the parties' intent. Language is deemed ambiguous "if it is susceptible to more than one reasonable interpretation."[59] An unreasonable interpretation produces an absurd result or one no reasonable person would have accepted when entering the contract.[60] "The parties' steadfast disagreement over interpretation will not, alone, render the contract ambiguous."[61] When a contract is ambiguous, we "must look beyond the language of the contract to ascertain the parties'

intentions."[62] But extrinsic, parole evidence cannot be used to manufacture an ambiguity in a contract facially having only one reasonable meaning.[63]

The parties in the preamble of the Note agreed the amount due under the Note "shall be due and payable on the earlier to occur of":

- Simulacra issuing stock to Prime Victor through an automatic conversation of the Note;

- Simulacra paying or setting aside the amount due under the Note;

- the third anniversary of the date of the Note—December 31, 2022; or

- an Event of Default.[64]

The parties reiterate in section 2(a) of the Note "[i]f not repaid or ***converted earlier***, the Outstanding Balance shall be ***immediately due and payable*** on the Maturity Date."[65] The language unambiguously requires Simulacra to pay the unpaid principal and interest by the Maturity Date of December 31, 2022 if none of the enumerated events—including Simulacra converting its debt to equity—occurred ***before*** the Maturity Date.

Simulacra did not repay with cash or shares before the Maturity Date of December 31, 2022. So the Outstanding Balance became "immediately due and payable on the Maturity Date."[66] But Simulacra made no payments on December 31, 2022. Simulacra defaulted on the Note on January 1, 2023 when it matured based on the unambiguous language of the Note because Simulacra "fail[ed] to pay . . . when due any principal payment on the due date hereunder[.]"[67]

### 2.  The Note does not permit a post-default conversion.

Simulacra argues even though the Maturity Date occurred without it paying back the debt in cash or shares, so it defaulted under the Note, it converted its debt owed under the Note to equity ***after*** the Maturity Date.[68] Prime Victor responds no reasonable reading of the Note permits a post-default conversion.[69] The Note instead makes clear Simulacra could only convert its debt to equity

before the Maturity Date, or before the Note terminated in some other manner.[70] We agree with Prime Victor.

We first look to the reasoning offered by judges considering post-default conversion rights and non-payment of promissory notes. We are persuaded by Judge Carpenter's thoughtful analysis in *College Health & Investment, L.P. v. Diamondhead Casino Corporation*. In *Diamondhead*, a casino received $150,000 from an investor, executed a note for $150,000, paid nothing on the principal, defaulted but then asserted it complied with the terms of the note by converting the amount of the loan to its common stock which had little to no value.[71] The investor then sued the casino.[72] The casino argued it had the right to convert the amount of the loan to common stock regardless of the default so it tendered the relief sought by the investor.[73]

Judge Carpenter explained if the casino's argument had merit he "would truly be declaring that they had hit the 'Jackpot,'" but he would "not play with their dice" and found "the [casino's] position is not supported by any reasonable reading of the terms of the note[.]"[74] Judge Carpenter explained the casino defaulted on the note when the maturity date occurred, and it made no payments.[75] Judge Carpenter acknowledged the casino's conversion right under the note, but found the right ceased when the maturity date of note passed and the investor exercised its default rights.[76] The note limited the casino's conversion right to a time period ***before*** the note matured.[77]

Judge Carpenter also found the parties' intent evidenced in a memorandum incorporated by reference into the note where the parties agreed the principal due under the Note "shall be payable in full on the Maturity Date, unless ***previously converted***[.]"[78] Judge Carpenter found, taken together, "the clear common sense reading of the documents reflect that the conversion right ends either at the date of maturity or upon the default of the note."[79]

Judge Carpenter returned to review these issues several months later in *World Energy Ventures, LLC v. Northwind Gulf Coast LLC*.[80] World Energy agreed to loan Northwind $7.5 million through two convertible promissory notes.[81] Northwind agreed to repay the notes within one year with five percent interest.[82] The parties agreed World Energy had the option to convert the unpaid balance on the note into equity "at any time[.]"[83]

Northwind failed to make payments under either notes when they matured, and World Energy issued written notices of default.[84] World Energy then sued Northwind for breach of contract.[85] Northwind conceded it failed to pay and did not dispute the terms of the notes, but countersued World Energy claiming its conduct prevented Northwind from paying the notes as they came due.[86] World Energy moved for partial judgment on the pleadings arguing Northwind admitted the elements of breach of contract.[87]

Judge Carpenter found the notes "expressly and unambiguously entitle [World Energy] to collect the sums due upon the Notes' respective maturity dates."[88] And "[e]qually clear under the Notes' terms are the grounds for finding the Notes in default, which explicitly include failure to pay upon maturity and authorize [World Energy] to demand payment upon such non-payment."[89] So Judge Carpenter granted World Energy's motion for partial judgment on its breach of promissory note claim.[90]

Like in *Diamondhead* and *World Energy Ventures*, there is no question Simulacra defaulted on the Note. The Note unambiguously required Simulacra to pay the amount owed by the Maturity Date of December 31, 2022 if none of the enumerated events in the preamble to the Note— including an automatic conversation of the Note under section 5—occurred ***before*** the Maturity Date.[91] The parties reiterate in section 2(a) of the Note "[i]f not repaid or converted ***earlier***, the Outstanding Balance shall be ***immediately due and payable*** on the Maturity Date."[92] Simulacra

10

never paid the Outstanding Balance due under the Note by December 31, 2022—the Maturity Date.[93] So an Event of Default occurred because Simulacra failed to pay the "principal payment on the due date hereunder[.]"[94] The parties agreed Simulacra had the right to repay the debt by cash or shares before December 31, 2022.  Simulacra did not do either. Prime Victor then exercised its post-default rights and declared the amount due and payable under the Note and demanded full payment in its February 5, 2023 letter to Simulacra.[95]

Like the casino in *Diamondhead*, Simulacra claims despite its default on January 1, 2023, it converted its unpaid debt to equity on February 14, 2023—about seven weeks ***after*** the Maturity Date.[96] But unlike in *Diamondhead*, where the parties agreed to limit the casino's conversion period to a time "prior to the Maturity Date[,]" and unlike in *World Energy Ventures* where the parties agreed World Energy had the option to convert the unpaid balance on the note into equity "at any time", Prime Victor and Simulacra agreed to limit the automatic conversion period to a time "before the ***termination*** of" the Note.[97]

Termination is not a defined term in the Note. We must now consider whether the undefined word "termination" renders the Note ambiguous.  What does "termination" mean when the parties granted Simulacra the right to repay the debt by either cash or converted shares before December 31, 2022?  Does it mean Simulacra could repay through converted shares whenever it wanted to?

### i.   The word "termination" does not render the Note ambiguous.

"Unless there is ambiguity, Delaware courts interpret contract terms according to their plain, ordinary meaning," without resorting to extrinsic evidence.[98] We "will not torture contractual terms to impart ambiguity where ordinary meaning leaves no room for uncertainty."[99]

We are guided by Judge LeGrow's reasoned analysis in *Bay Point Capital Partners L.P. v. Fitness Recovery Holdings*, *LLC* where she considered whether a contract contained ambiguous terms.[100] Bay Point—as an unsecured creditor—loaned Fitness Recovery $6.5 million, which Fitness never repaid.[101] Bay Point sued Fitness and moved for judgment on the pleadings against Fitness for its breach of contract and declaratory judgment claims.[102] Bay Point argued Fitness defaulted under the parties' promissory notes and purchase agreement by failing to pay the outstanding principal, interest, and exit fees by the December 31, 2022 maturity date.[103]

Fitness argued it did not breach because it extended the notes' maturity date through an amendment to the purchase agreement with the only secured lender to the note—Peak Credit LLC.[104] Fitness pointed to two sections of the notes to support its argument it could amend without Bay Point's consent.[105]

Fitness claimed, under its interpretation of the agreement, Bay Point waived its right to consent to an amendment and the agreement permitted an amendment at Fitness's and Peak's sole discretion.[106] Bay Point responded the parties never agreed to allow Fitness to amend the notes without Bay Point's consent.[107] Bay Point viewed the sections cited by Fitness as "consent right provisions" which gave Peak a right to consent to any amendment although Peak is not a party to the notes and required its consent be written rather than oral.[108] And Bay Point argued the amendment to extend the maturity date could not be effective under Delaware law because Fitness entered into it without Bay Point's consent and without Bay Point receiving any consideration for it.[109] Fitness acknowledged Bay Point's interpretation as reasonable, but argued it also presented a reasonable interpretation rending the note ambiguous.[110]

Judge LeGrow found Fitness's interpretation unreasonable.[111] Judge LeGrow explained the sections of the agreement relied on by Fitness is phrased in the negative and "preclude any

12

amendment unless Fitness and Peak consent to it and it is memorialized in writing."[112] But Fitness's interpretation of these sections would alter the common law by "giving Peak the right to consent to all amendments, even though Peak is not a party to the [n]otes" and would grant "Fitness and Peak the unfettered right to modify the parties' agreement to [Bay Point's] detriment."[113] Judge LeGrow recognized "[h]ad the parties intended such an extreme result, they would have expressly stated that the unsecured creditors affirmatively were waiving their rights."[114] But Judge LeGrow noted "the language on which Fitness relies is stated in the negative: it restricts modification or amendment without the written consent of certain entities, but does not affirmatively grant those entities the unilateral right to amend the agreements."[115]

Judge LeGrow found Fitness's interpretation would lead to an absurd result "contradicting the rule [she] should interpret contracts in a way that avoids absurdities."[116] Judge LeGrow reasoned "[t]aken to its logical conclusion, Fitness's interpretation would allow Peak and Fitness to rewrite all the essential terms in the parties' agreement, including reducing the interest rate to zero, extending the maturity date into perpetuity, or reducing the principal amount owed under the [n]otes."[117] So "[b]ecause the promissory notes' plain terms do not waive the unsecured creditors' right to agree to any modification of the agreement," Judge LeGrow granted Bay Point's motion for judgment on the pleadings.[118]

Now we look to the Note the parties agreed to in 2019 and whether Simulacra could engage in a post-default conversion in 2023. We already found the Note unambiguously required the Outstanding Balance be immediately due and payable on the Maturity Date "[i]f not repaid or *converted earlier*[.]"[119] And Simulacra's failure to pay or convert on December 31, 2022 resulted in it being in default on January 1, 2023. Simulacra claims on February 14, 2023—about seven weeks *after* the Maturity Date—it then decided to convert the outstanding debt owed under the

Note to equity.[120] But the parties agreed only "[i]f there is a Qualified Financing **before the termination of this Note** . . . the Outstanding Balance shall be automatically converted into Conversion Shares[.]"[121]

But the parties left the word "termination" undefined in the Note. We can "look to dictionaries for assistance in determining the plain meaning of terms which are not defined in a contract," as "dictionaries are the customary reference source that a reasonable person in the position of a party to a contract would use to ascertain the ordinary meaning of words not defined in the contract."[122] Black's Law Dictionary tells us "termination" means "[t]he act of ending something[.]"[123] Here, the ordinary meaning of the word "termination" leaves no room for ambiguity. The Note ended when the Maturity Date passed, and Simulacra defaulted under the Note since it failed to pay the Outstanding Balance which became immediately due and payable on the Maturity Date. The parties granted Simulacra the right to repay with converted shares before December 31, 2022. No one disputes this agreement.

But Simulacra contends "nothing in the Note precludes a Qualified Financing event from occurring **after** the Maturity Date" because the Note only requires it convert its debt to equity "**before the termination** of the Note," and "termination" is an undefined term.[124] But similar to Judge LeGrow's reasoned decision in *Bay Point*—where she found Fitness's interpretation of the notes unreasonable as it, among other things, relied on a phrase in the negative to support its interpretation the notes affirmatory granted certain rights—Simulacra relies on the phrase limiting its conversion rights to occur "before the termination of the Note" to allow it to convert any time "after the Maturity Date."[125] But we cannot read these terms into the Note. The language Simulacra relies on restricts a conversion before the termination of the Note but does not affirmatively grant a conversion after the Maturity Date or post-default. The parties could have agreed to a right to

convert "at any time" like the parties did in *World Energy Ventures*, but they did not do so.[126] They instead specifically agreed Simulacra could repay the debt in cash or converted shares before December 31, 2022.

Simulacra also argues the word "termination" must mean something different than "Maturity Date" because giving the two words "the same meaning as other defined contractual terms would render it mere surplusage and would interfere with the Note's overarching plan."[127] So, according to Simulacra, "it is conceivable that the Note contains terms which cannot be indisputably reconciled on the face of the Note making it ambiguous."[128] Considering the Note as a whole, the clear common sense reading of the document reflects the conversion right ended upon the termination of the Note, which occurred when the Maturity Date passed and Simulacra defaulted as it failed to make any payments. Under this reading, "termination" and "Maturity Date" do not have the same meaning. The Note could also terminate if Simulacra paid Prime Victor before the Maturity Date, or if it converted the Note any time before the Maturity Date. So the term "termination" is broader then, and not the same as, the term "Maturity Date[.]"

We, like Judge LeGrow, find Simulacra's interpretation would lead to an absurd result "contradicting the rule [we] should interpret contracts in a way that avoids absurdities."[129] The parties agreed "[i]f not repaid or converted earlier, the Outstanding Balance shall be immediately due and payable on the Maturity Date."[130] Simulacra's interpretation, as confirmed during oral argument, would permit it to either repay or convert at any time. If Simulacra could convert its debt to equity at any time, then based on its own interpretation of the Note, it could also repay the Note in cash at any time since it agreed it could "repa[y] *or* convert[]" and "or" is often construed as a disjunctive.[131]

But this interpterion renders the word "earlier" meaningless because Simulacra could then elect to never pay the Outstanding Balance even once the Maturity Date passed and convert Prime Victor's debt to equity years after it already defaulted under the Note. Or it could simply never repay the Note at all. As Judge LeGrow recognized in *Bay Point* "[h]ad the parties intended such an extreme result, they would have expressly stated" a conversion or repayment could occur years after the Maturity Date or post-default.[132] But instead, the parties unambiguously agreed the Note had to be converted ***earlier*** than the Maturity Date or else the Outstanding Balance became immediately due and payable.[133] And the parties limited Simulacra's conversion right to before the "termination" of the Note.[134]

The Note unambiguously required Simulacra to pay the Outstanding Balance "immediately . . . on the Maturity Date" "[i]f not repaid or converted ***earlier***[.]"[135] Simulacra did not repay before the Maturity Date or covert the Note earlier than the Maturity Date. And Simulacra could only convert the Outstanding Balance "before the termination of [the] Note."[136] Read together, these terms mean Simulacra could not exercise post-default conversion rights ***after*** the Outstanding Balance had already become immediately due and payable under the Note because the Note limited its conversion rights to occur before the Note terminated. So Simulacra's conversion right ceased when the Maturity Date passed without re-payment.

### ii.  The parties did not agree to a cure period.

Simulacra contends even if we find the Note does not permit a post-default conversion, it had an opportunity to cure and convert the Note during the cure period.[137] It points to section 3(a) of the Note where the parties agreed an Event of Default occurs when Simulacra fails to pay:

(i) when due any principal payment on the due date hereunder ***or*** (ii) any interest payment or other payment required under the terms of this Note on the date due and

such payment shall not have been made within forty-five (45) days of [Simulacra's] receipt of written notice to [Simulacra] of such failure to pay[.][138]

Simulacra failed to pay as defined under subsection one because it failed to pay or convert to shares the "principal payment on the due date"—December 31, 2022. But it contends it still had the forty-five day cure period agreed to in subsection two because "[t]he only alternative would be to only grant a cure period for interest payments, which would be illogical."[139] We disagree.

Subsection one and subsection two are separated by the word "or."[140]   The word "or" is often construed as a disjunctive while the word "and" is construed as a conjunctive.[141] "[The] ordinary use [of 'or'] is almost always disjunctive, that is, the words it connects are to 'be given separate meanings[.]'"[142]

The disjunctive "or" separating subsection one and subsection two plainly contradicts Simulacra's argument the forty-five-day cure period applies to both sections.[143] Simulacra does not have a cure period for failing to pay the principal payment. And to the extent Simulacra argues Prime Victor needed to provide notice of its default, the parties agreed in section 7(g) of the Note to waive notice of the default, and all other notices [144]

## B.  The Note terminated following Simulacra's material breach.

We also cannot ignore the Note terminated when Simulacra breached the contract by defaulting under the Note when it failed to pay either by cash or shares by the Maturity Date. So we reject Simulacra's argument "so long as interest is running, the Note cannot be said to be terminated."[145]

Under Delaware law, "[a] party who first commits a material breach of a contract cannot enforce the contract going forward."[146] And a "[m]aterial breach acts as a termination of the contract going forward, abrogating any further obligations to perform by the non-breaching party."[147] A material breach is "a failure to do something . . . so fundamental to a contract that the

failure to perform [the] obligation defeats the essential purpose of the contract or makes it impossible for the other party to perform under the contract."[148]

In *Diamondhead*, Judge Carpenter considered how the essential purpose of the casino and the investor's contract had been for the investor to loan the casino money for two years with a twelve percent interest rate with the investor expecting repayment of the principal amount by a certain date, plus interest owed.[149] So by failing to perform its obligations under the contract, the casino defaulted on the note and defeated the essential purpose of the contract.[150] Judge Carpenter found the casino materially breached the contract by defeating its essential purpose so it did not have the right to convert the unpaid principal and interest to stock ***after*** the material breach, and could not assert its obligations under the note had been satisfied.[151]

Like in *Diamondhead*, the principal purpose of the contract between Prime Victor and Simulacra had been for Prime Victor to loan Simulacra one million dollars for three years at a rate equal to eight percent compounded annually, and Simulacra agreed to repay the one million dollars plus interest owed by December 31, 2022 unless "repaid or converted earlier[.]"[152]  But Simulacra did not repay the Note by December 31, 2022 or convert the unpaid balance before December 31, 2022. By failing to perform its obligations under the contract, Simulacra defaulted on the Note and defeated the essential purpose of the contract. So Simulacra could not convert the unpaid principal and interest to equity after its material breach and cannot now claim it satisfied its obligations owed under the Note.

### C. Prime Victor is entitled to post-judgment interest and reasonable attorneys' fees.

Prime Victor argues it is entitled to the Outstanding Balance due under the Note, contractual interest, post-judgment interest at the federal statutory rate, and attorneys' fees and costs.[153] It asks we enter judgment in its favor in the following amount: (1) $1,259,712, which is

the unpaid principal and interest owed on the Note as of December 31, 2022 (the Outstanding Balance as of the Maturity Date); (2) post-maturity date interest at ten percent on the Outstanding Balance as of the Maturity Date through the date of judgment, which is accruing at a rate of $345.13 per diem from January 1, 2023; (3) post-judgment interest at the federal statutory rate; and (4) attorneys' fees, costs and other expenses.[154]

Simulacra does not dispute Prime Victor is entitled to contractual interest, post-judgment interest at the federal statutory rate, or attorneys' fees and costs. "When a party files an opposition brief and fails to contest an issue raised in the opening brief, the issue is considered waived or abandoned by the non-movant."[155]

### 1. Prime Victor is entitled to post-maturity date interest at ten percent.

Simulacra agreed through the Note to repay Prime Victor "the principal sum of One Million Dollars ($1,000,000) . . . together with interest from the date of this Note on the unpaid principal balance at a rate equal to 8% compounded annually."[156] And the parties agreed if Simulacra defaulted under the Note the interest accruing on the Note would increase to ten percent, but if Simulacra cured the default, the interest would return to eight percent.[157] So Prime Victor is entitled to post-maturity date interest at ten percent on the Outstanding Balance as of the Maturity Date through the date of judgment. We today grant Prime Victor leave to timely identify the amount of this interest before entering judgment.

### 2. Simulacra must pay post-judgment interest at the federal statutory rate.

"[P]ost-judgment interest is mandatory for damages awarded in civil cases in federal district court."[158] And like Judge Noreika found in *Well Thrive Ltd. v. SemiLEDs Corporation* post-judgment interest in "[t]his case . . . in federal court based on diversity jurisdiction and the money ordered returned is money recovered in district court" is governed by 28 U.S.C. § 1961.[159]

19

So Prime Victor is entitled to the unpaid principal and interest owed on the Note as of December 31, 2022 and post-maturity date interest at ten percent on the Outstanding Balance as of the Maturity Date through the date of judgment, plus post-judgment interest at the federal statutory rate. We today grant Prime Victor leave to timely identify the amount of this interest before entering judgment.

### 3. We grant Prime Victor leave to petition for reimbursement of reasonable attorneys' fees and costs.

The parties agreed "[t]he prevailing Party shall be entitled to reasonable attorney's fees, costs, and necessary disbursements in addition to any other relief to which such Party may be entitled."[160] Fee-shifting agreements are enforced under Delaware law.[161] In determining which party should be considered the "prevailing party," Delaware courts apply the "predominance in the litigation" standard.[162] We look to which party prevailed "on the case's chief issue."[163]

We now grant judgment in Prime Victor's favor for its breach of contract claim. So Prime Victor as the prevailing Party is entitled to reasonable attorneys' fees and costs.[164] But Prime Victor presently offers no evidence in support of its reasonable fees and costs incurred. We grant Prime Victor leave to timely petition for reimbursement of reasonable attorneys' fees and costs, and Simulacra may timely object to the amount of Prime Victor's requested fees and costs.

## III.    Conclusion

We grant Prime Victor judgment in its favor for its breach of contract claim. No material issue of fact remains to be resolved. The Note unambiguously required Simulacra to pay Prime Victor the amount due under the Note by the Maturity Date if not repaid or converted earlier. Simulacra did not pay or covert the Outstanding Balance before the Maturity Date. It defaulted on the Note. The Note does not allow for a post-default conversion. Simulacra breached the unambiguous terms of the Note. Prime Victor is entitled to the Outstanding Balance due under the

Note, contractual interest, post-judgment interest at the federal statutory rate, and reasonable

attorneys' fees and costs.

---

[1] When deciding a motion for judgment on the pleadings, we may consider "matters of public record as well as authentic documents upon which the complaint is based, if attached to the complaint or as an exhibit to the motion." *EMSI Acquisition, Inc. v. RSUI Indem. Co*., 306 F. Supp. 3d 647, 652 (D. Del. 2018), *aff'd*, 787 F. App'x 97 (3d Cir. 2019). We may also consider the parties' stipulated undisputed facts. *See Alcedo v. State Farm Mut. Auto. Ins. Co*., 391 F. Supp. 3d 452, 454 (E.D. Pa. 2019) (considering the parties' stipulated undisputed facts in memorandum granting insurer judgment on the pleadings).

[2] D.I. 1 ¶ 3.

[3] *Id*. ¶ 8.

[4] *Id*.

[5] *Id*. ¶¶ 9–10.

[6] *Id*.

[7] *Id*. ¶ 11.

[8] *Id*. ¶ 12.

[9] D.I. 1-1 at 2.

[10] The parties agreed:

> All unpaid principal, together with any then unpaid and accrued interest and other amounts payable hereunder, shall be due and payable on the earlier to occur of (i) the issuance of Capital Stock to [Prime Victor] pursuant to the automatic conversation of this Note under **Section 5**; (ii) the payment, or setting aside for payment, of amount due to [Prime Victor] pursuant to **Section 2** or **Section 5**, as applicable; (iii) the third anniversary of the date of this Note (the "**Maturity Date**") or (iv) the occurrence of an Event of Default.
>
> *Id*. at 2–3.

[11] D.I. 1 ¶¶ 15–16; D.I. 19 at 4.

[12] The parties agreed in section 2(a): "If not repaid or converted earlier, the Outstanding Balance shall be immediately due and payable on the Maturity Date." D.I. 1-1 at 5, § 2(a). The "Outstanding Balance" means "all principal, interest, costs and expenses due under the Note at the time of measurement." *Id*. at 4.

[13] Under section 5(a) of the Note, the parties agreed to an "Automatic Conversion upon a Qualified Financing" meaning:

> If there is a Qualified Financing before the termination of this Note, on the initial closing of such Qualified Financing, the Outstanding Balance shall be automatically converted into Conversion Shares, the number of which shall equal the Outstanding Balance divided by the Conversion Price.

> *Id*. at 7, § 5.

"Qualified Financing" means "a transaction or series of transactions" where Simulacra "issues and sells shares of its Capital Stock for aggregate gross proceeds of at least $1,000,000.00 . . . with the principal purpose of raising capital." *Id*. at 5. Conversion Shares include "shares of the equity securities issued in the Qualified Financing[.]" *Id*. at 3.

[14] The parties agreed an "Event of Default" would occur under the Note if Simulacra failed to pay:

> (i) when due any principal payment on the due date hereunder or (ii) any interest payment or other payment required under the terms of this Note on the date due and such payment shall not have been made within forty-five (45) days of [Simulacra's] receipt of written notice to [Simulacra] of such failure to pay[.]

> *Id*. at 6, § 3(a).

[15] "Upon an Event of Default and continuing during the Event of Default, the interest accruing on this Note shall increase to ten (10%) percent and if the Event of Default is cured, the interest rate shall return to eight (8%) percent." *Id*. at 6–7, § 4.

[16] The parties agreed in section 7(g) of the Note:

> [Simulacra] hereby waives notice of default, presentment or demand for payment, protest or notice of nonpayment or dishonor and all other notices or demands relative to this instrument.

> *Id*. at 10, § 7(g).

[17] The parties agreed in section 4 of the Note:

> [Prime Victor] may, by written notice to [Simulacra], declare all outstanding Obligations payable by [Simulacra] hereunder to be immediately due and payable without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived, anything contained herein or in the other Transaction Documents to the contrary notwithstanding.

> *Id*. at 6–7, § 4.

[18] The parties, through the Amended and Restated Subscription Agreement executed the same day as the Note, agreed:

22

Each Party will bear its own costs in respect of any disputes arising under this Agreement. The prevailing Party shall be entitled to reasonable attorney's fees, costs, and necessary disbursements in addition to any other relief to which such Party may be entitled.

D.I. 1-2 at 19, § 9.12.

[19] D.I. 19 at 4.

[20] D.I. 1-3 at 2.

[21] D.I. 1-4.

[22] *Id*.

[23] D.I. 1.

[24] *Id*. ¶¶ 27–28.

[25] *Id*. ¶ 30.

[26] D.I. 8. Simulacra's affirmative defenses include: (1) Prime Victor's claims are barred because of Prime Victor's antecedent breach; (2) the Complaint fails to state claims upon which relief can be granted; (3) the Complaint should be dismissed on grounds of waiver and acquiescence; and (4) Prime Victor's claims are barred, in whole or in part, by the doctrine of accord and satisfaction. D.I. 8 ¶¶ 32–35. We struck Simulacra's affirmative defense based on the doctrine of release and struck its reservation to assert additional defenses without prejudice following our April 26, 2023 pretrial conference. D.I. 20 ¶ 2.

[27] D.I. 8 ¶ 25; D.I. 19 at 4.

[28] D.I. 8 ¶ 25.

[29] D.I. 25. A party may move for judgment on the pleadings "[a]fter the pleadings are closed—but early enough not to delay trial[.]" Fed. R. Civ. P. 12(c). We analyze motions for judgment on the pleadings "under the same standards that apply to a Rule 12(b)(6) motion." *Wolfington v. Reconstructive Orthopaedic Assocs. II PC*, 935 F.3d 187, 195 (3d Cir. 2019) (quoting *Revell v. Port Auth. of N.Y. & N.J.*, 598 F.3d 128, 134 (3d Cir. 2010)). We "must view the facts presented in the pleadings and the inferences to be drawn therefrom in the light most favorable to the nonmoving party[.]" *Vitamin Energy, LLC v. Evanston Ins. Co.*, 22 F.4th 386, 392 n.6 (3d Cir. 2022) (quoting *Wolfington*, 935 F.3d at 195). We may only grant a motion for judgment on the pleadings if "the movant clearly establishes [] no material issue of fact remains to be resolved" and the movant "is entitled to judgment as a matter of law." *Id.* (quoting *Wolfington*, 935 F.3d at 195). We consider "the complaint, exhibits attached to the complaint, matters of public record," and "undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010).

[30] D.I. 26.

---

[31] D.I. 30. Simulacra did not dispute two of Prime Victor's arguments in its Opposition brief, or during oral argument: (1) none of Simulacra's affirmative defenses preclude judgment on the pleadings; and (2) Prime Victor is entitled to attorneys' fees, costs, contractual interest, and post-judgment interest.

[32] D.I. 31.

[33] D.I. 33.

[34] D.I. 1.

[35] D.I. 26 at 12–26.

[36] *Id*.

[37] D.I. 19 at 4.

[38] D.I. 30 at 5.

[39] *VLIW Tech., LLC v. Hewlett-Packard Co*., 840 A.2d 606, 612 (Del. 2003).

[40] D.I. 1-1 at 10, § 7(h); D.I. 19 at 4 ("The Note is a valid and binding contract governed by Delaware law."); *See also Beal Bank, SSB v. Lucks*, 791 A.2d 752, 757 n.13 (Del. Ch. 2000) ("It is a common sense rule that promissory notes are a variety of contract and are to be so construed and enforced.") (citations and quotations omitted).

[41] D.I. 19 at 4.

[42] D.I. 26 at 12–17.

[43] D.I. 30 at 8–13.

[44] *Id*. at 8 (emphasis added).

[45] *Id*.

[46] *Id*. at 10.

[47] *Id*.

[48] *Id*. at 11.

[49] *Daniel v. Hawkins*, 289 A.3d 631, 645 (Del. 2023).

[50] *Salamone v. Gorman*, 106 A.3d 354, 367–68 (Del. 2014) (quoting *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010)).

[51] *Lorillard Tobacco Co. v. Am. Legacy Foundation*, 903 A.2d 728, 739 (Del. 2006).

---

[52] *Sunline Commercial Carriers, Inc. v. CITGO Petroleum Corp.*, 206 A.3d 836, 846 (Del. 2019) (internal citations omitted).

[53] *Manti Holdings, LLC v. Authentix Acquisition Co., Inc.*, 261 A.3d 1199, 1208 (Del. 2021) (internal citations omitted).

[54] *Id.* (quoting *Osborn*, 991 A.2d at 1159–60).

[55] *Sunline Commercial Carriers, Inc.*, 206 A.3d at 846.

[56] *Manti*, 261 A.3d at 1208 (quoting *Osborn*, 991 A.2d at 1159–60).

[57] *BBD Beach, LLC v. Bayberry Dunes Ass'n*, 2022 WL 763466, at *3 (Del. Ch. Mar. 10, 2022) (citing *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 738 (Del. 2006) ("[D]ictionaries are the customary reference source that a reasonable person in the position of a party to a contract would use to ascertain the ordinary meaning of words not defined in the contract")).

[58] *Stein v. Wind Energy Holdings, Inc.*, 2022 WL 17590862, at *1 (Del. Super. Ct. Dec. 13, 2022) (quoting *New Castle Cnty. v. Crescenzo*, 1995 WL 21130, at *3 (Del. Ch. Feb. 11, 1985); *Urdan v. WR Cap. Partners, LLC*, 2019 WL 3891720, at *15 (Del. Ch. Aug. 19, 2019), *aff'd*, 243 A.3d 668 (Del. 2020) (internal citations omitted)).

[59] *Manti*, 261 A.3d at 1208 (quoting *Osborn*, 991 A.2d at 1160).

[60] *Osborn*, 991 A.2d at 1160 (Del. 2010) (internal citations omitted).

[61] *Manti*, 261 A.3d at 1208 (quoting *Osborn*, 991 A.2d at 1160).

[62] *GMG Cap. Invs., LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 780 (Del. 2012) (internal citations omitted).

[63] *Merck & Co., Inc. v. Bayer AG*, 2023 WL 2751590, *12 (Del. Ch. Apr. 3, 2023) (internal citations omitted).

[64] D.I. 1-1 at 2–3 (emphasis added).

[65] *Id.* at 5, § 2(a) (emphasis added).

[66] *Id.*

[67] *Id.* at 6, § 3(a).

[68] D.I. 30 at 8–13.

[69] D.I. 31 at 6–9.

[70] *Id.*

[71] *Coll. Health & Inv., L.P. v. Diamondhead Casino Corp.*, 2015 WL 5138093, at *2 (Del. Super. Ct. July 2, 2015).

[72] *Id.* at *1.

[73] *Id.*

[74] *Id.*

[75] *Id.*

[76] *Id.*

[77] The parties in *Diamondhead* agreed:

> The Borrower acknowledges that it has not and will not be permitted to assert any right of set-off or counterclaim with respect to its obligation to pay the principal and interest as of the Maturity Date as set forth herein and hereby waives any and all defenses it may have in the future with respect to such payment, except to the extent that (a) this Note has been converted into Common Stock in accordance with Article II ***prior to the Maturity Date***

> *Id.* (emphasis in original).

[78] *Id.* at *3 (emphasis in original).

[79] *Id.*

[80] *World Energy Ventures, LLC v. Northwind Gulf Coast LLC*, 2015 WL 6772638, at *1 (Del. Super. Ct. Nov. 2, 2015).

[81] *Id.*

[82] *Id.*

[83] The parties in World Energy agreed:

> [World Energy] shall have the option, but not the obligation, ***exercisable at any time***, to convert the then unpaid balance on the applicable Note, together with unpaid interest accrued but unpaid at such time, into equity in, at Investor's option, either Northwind, its designees, Affiliates, related companies or any other company or entity in which Northwind owns an interest and which is developing Hydrocarbon Interests within the [areas of mutual interest].

> *Id.* at n.6 (emphasis added).

[84] *Id.* at *3.

[85] *Id.*

26

[86] *Id.*

[87] *Id.*

[88] *Id.* at *5.

[89] *Id.*

[90] *Id.* Judge Carpenter found "[w]hile Northwind's surviving counterclaims . . . may afford relief if successful on the merits at trial and minimize the overall damages that would be available under the Notes, they are not a defense that would negate [World Energy's] ability to obtain partial judgment on two valid promissory notes." *Id.* Judge Carpenter denied World Energy's request for entry of final judgment under the Note because Northwind's two counterclaims survived. *Id.* at *14.

[91] D.I. 1-1 at 2–3.

[92] *Id.* at 5, § 2(a) (emphasis added).

[93] D.I. 19 at 4.

[94] D.I. 1-1 at 6, § 3(a).

[95] D.I. 1-4.

[96] D.I. 8 ¶ 25; D.I. 19 at 4.

[97] D.I. 1-1 at 7, § 5(a) (emphasis added).

[98] *Tetragon Fin. Grp. Ltd. v. Ripple Labs Inc.*, 2021 WL 1053835, at *4 (Del. Ch. Mar. 19, 2021) (quoting *Alta Berkeley VI C.V. v. Omneon, Inc.*, 41 A.3d 381, 385 (Del. 2012)).

[99] *Alta Berkeley*, 41 A.3d at 388 (quoting *Rhone-Poulenc Basic Chem. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992)).

[100] *Bay Point Cap. Partners L.P. v. Fitness Recovery Holdings, LLC*, 2021 WL 5578705, at *1 (Del. Super. Ct. Nov. 30, 2021).

[101] *Id.* at *3.

[102] *Id.*

[103] *Id.* The notes required Fitness to pay interest at a rate of ten percent and to repay the principal, plus interest and exit fees, by the maturity date which the parties defined as the earlier of December 31, 2020, or five business days after the maturity date for the debtor-in-possession loan. *Id.* at *2.

[104] *Id.* at *3.

[105] *Id.* Fitness pointed to section 7.6 and 9.6, where the parties agreed:

**Section 7.6**: No amendment, modification or waiver of any provision of this Agreement or consent to departure therefrom shall be effective unless in writing and approved by [Fitness] and [Peak].

**Section 9.6**: No amendment, modification or waiver of any provision of this Agreement or consent to departure therefrom shall be effective unless in writing an approved by [Fitness] and [Peak].

*Id.*

[106] *Id.*

[107] *Id.*

[108] *Id.*

[109] *Id.*

[110] *Id.* at *5.

[111] *Id.*

[112] *Id.*

[113] *Id.*

[114] *Id.*

[115] *Id.*

[116] *Id.*

[117] *Id.*

[118] *Id.* at *1.

[119] D.I. 1-1 at 5, § 2(a) (emphasis added).

[120] D.I. 8 ¶ 25; D.I. 19 at 4.

[121] D.I. 1-1 at 7, § 5 (emphasis added).

[122] *Tetragon Fin. Grp. Ltd.*, 2021 WL 1053835, at *4 (quoting *Lorillard Tobacco Co.*, 903 A.2d at 738); *see also BBD Beach, LLC*, 2022 WL 763466, at *3 (noting when ruling on a motion for judgment on the pleadings "[i]t is well-established that Delaware courts can look to dictionaries for assistance in determining the intended meaning of contract terms.").

[123] *Termination*, Black's Law Dictionary (11th ed. 2019).

[124] D.I. 30 at 8 (emphasis added).

[125] *Id.*

[126] *World Energy Ventures, LLC*, 2015 WL 6772638, at *1.

[127] D.I. 30 at 10.

[128] *Id.*

[129] *Bay Point*, 2021 WL 5578705, at *5.

[130] D.I. 1-1 at 5, § 2(a).

[131] *Id.; see also Weinberg v. Waystar, Inc.*, --- A.3d ---, 2023 WL 2534004, at *5 n.21 (Del. Mar. 16, 2023).

[132] *Bay Point,* 2021 WL 5578705, at *5.

[133] D.I. 1-1 at 5, § 2(a).

[134] *Id.* at 7, § 5.

[135] *Id.* at 5, § 2(a) (emphasis added).

[136] *Id.* at 7, § 5.

[137] D.I. 30 at 13–14.

[138] D.I. 1-1 at 6, § 3(a) (emphasis added).

[139] D.I. 30 at 13.

[140] D.I. 1-1 at 6, § 3(a).

[141] *Weinberg*, 2023 WL 2534004, at *5.

[142] *IDT Corp. v. U.S. Specialty Ins. Co*., 2019 WL 413692, at *9 n.100 (Del. Super. Ct. Jan. 31, 2019) (quoting *Loughrin v. United States*, 573 U.S. 351, 357 (2014) (citing *United States v. Woods*, 571 U.S. 31, 45 (2013)).

[143] *See Martin Marietta Materials, Inc. v. Vulcan Materials Co*., 68 A.3d 1208, 1225 (Del. 2012).

[144] D.I. 1-1 at 10, § 7(g).

[145] D.I. 30 at 9.

[146] *Preferred Inv. Servs., Inc. v. T & H Bail Bonds, Inc*., 2013 WL 3934992, at *21 (Del. Ch. July 24, 2013) (citing *BioLife Solutions, Inc. v. Endocare, Inc*., 838 A.2d 268, 278 (Del. Ch. 2003)).

---

[147] *Carey v. Est. of Myers*, 2015 WL 4087056, at *20 (Del. Super. Ct. July 1, 2015), *aff'd*, 132 A.3d 749 (Del. 2016) (internal citations omitted).

[148] *Tektree, LLC v. Borla Performance Indus., Inc*., 2013 WL 5230705, at *4 (Del. Com. Sept. 16, 2013) (quoting *Shore Investments, Inc. v. Bhole, Inc*., 2011 WL 5967253, at *5–6 (Del. Super. Nov. 28, 2011)).

[149] *Diamondhead*, 2015 WL 5138093, at *3.

[150] *Id.*

[151] *Id.*

[152] D.I. 1-1 at 5, § 2(a).

[153] D.I. 26 at 17–18.

[154] *Id*. at 18.

[155] *Delaware v. BP Am. Inc.,* 578 F. Supp. 3d 618, 627 n.6 (D. Del. 2022) (quoting *Peters v. Ryan*, 2017 WL 1393692, at *2 (D. Del. Apr. 13, 2017)).

[156] D.I. 1-1 at 2.

[157] *Id*. at 6–7, § 4.

[158] *Well Thrive Ltd. v. SemiLEDs Corp*., 2021 WL 1318131, at *3 (D. Del. Apr. 8, 2021) (citing 28 U.S.C. § 1961(a) ("Interest shall be allowed on any money judgment in a civil case recovered in a district court.")). Congress, through 28 U.S.C. § 1961(a), provides:

> Interest shall be allowed on any money judgment in a civil case recovered in a district court . . . Such interest shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding[ ] the date of the judgment.

> 28 U.S.C. § 1961(a).

Although Prime Victor does not request post-judgment interest in its Complaint, post-judgment interest is mandatory by federal statute. *Bleecker v. Zetian Sys., Inc*., 2013 WL 5951162, at *9 (S.D.N.Y. Nov. 1, 2013).

[159] *Well Thrive Ltd.*, 2021 WL 1318131, at *3.

[160] D.I. 1-2 at 19, § 9.12.

[161] *Greenstar, LLC v. Heller*, 934 F. Supp. 2d 672, 697 (D. Del. 2013).

---

[162] *APEX Fin. Options, LLC v. Gilbertson*, 2022 WL 9991424, at *2 (D. Del. Oct. 17, 2022) (internal citations omitted).

[163] *Id.* (internal citations omitted).

[164] *See Washington v. Preferred Commc'n Sys., Inc.,* 157 A.3d 1226, 1233 (Del. 2017).